You can call the first case for us. Ms. Mazurkiewicz versus Northwestern Memorial. And if my counsel can stand up, please, and approach the bench. I don't think you guys have been here before, right? No, we haven't. Okay, all right. Well, then I'll just introduce everyone to you. I'm Judge Lample. To my right is Judge Larkin. To my left is Judge Reyes. And we will be the panel here in your case. This is the way we normally handle it. We give each side 15 minutes. If the appellant wants to reserve a few minutes for rebuttal, he certainly can. We're not tied to 15 minutes. If you're so interested and we have to go along, we'll certainly give it to you. And the other side can respond. The poll in front of you is not a microphone, so please keep your voice up. It records your voice. All right? So if you'd identify yourselves for the record. You're ISO for the appellant. Hi, Chief Justice. Nice to meet you. Hayden Dinges. Oh, well, I wish I was Chief Justice. Nice to meet all of you, Judge. Hayden Dinges on behalf of the appellant, Ms. Lori Mazurkiewicz. Say your last name for me. Dinges. Is it D-I-G-A-S? D-I-N-G-E-S. Okay. Thank you all. Thank you. Good morning. Antonio Calderon on behalf of Northwestern Memorial Hospital. Thank you. And, counsel, how long do you want to reserve for rebuttal? Three minutes, please. All right. Then you can have a seat. Again, keep your voice up so that we can hear. You should also know we've, of course, read your briefs. We'll try not to interrupt you. If we do, I'm sorry in advance. But we will extend your time if we have to ask a lot of questions. Okay. Very well. Thank you, Your Honor. You're welcome. Oh, you can absolutely begin. And I wanted to start out by asking a question because I know you have more than one issue, but one that could be dispositive of at least two of the issues in your cases, the tortious interference claims. I'd like you to address that first because, of course, the other side has said one thing, and I've read the rules, so I want you to tell me how this court has jurisdiction to hear the tortious interference claims. Yes, Your Honor. Okay. May it please the Court. So starting with your question, Chief Justice, in this case, Manicopa, the appellant incorrectly listed the date of the order being appealed in the first notice of appeal. It listed the date as October and the counts being counts two and three from the third amended complaint rather than the fourth amended complaint. In the first amended notice of appeal, it also stated that the appellant was appealing from a final judgment. Of course, the dismissal of the third amended complaint and counts two and three from the third amended complaint was not a final judgment. Given that the appellant indicated that she was appealing from counts two and three and from a final judgment, that sufficiently put opposing counsel on notice of the relief being requested as well as the counts and evidence at issue. But my point is, I'm not talking about notice to them. I'm talking about this court's jurisdiction based upon Supreme Court Rule 303, several cases including the Supreme Court case Ratcliffe. So I want you to tell me. I know it's your fault. I know it's your fault. I don't mean you, counsel, because I don't know if you filed the notice of appeal or the amended notice of appeal. But the rule seems to limit 30 days of which you can amend to your heart's content without leaving court. After that, you have 30 days according to, I can't remember the section now, I think it's D, to amend. And thereafter, it seems like the game is over. So that's what I want you to do. That's right. Sure. So, Your Honor, time and time again, appellate courts including the Fifth District and HPI Healthcare v. Mount Vernon Hospital have cautioned courts against putting the form over the substance in a notice of appeal. A jurisdictional bar is an extreme prohibition to consider these issues just completely barred from this court's consideration. And the rule is meant to be liberally construed. It's not meant to be used as a sword in such an aggressive fashion. And really the dispositive aspect of that exception to the rule is that so long as the other party is put on notice and not prejudiced, that's sufficient enough to allow the issues to be adjudicated by this court. In this case, there shouldn't be a jurisdictional bar simply because of a clerical error. Yes, the incorrect date was listed in the notice of appeal, but opposing counsel was put on notice six months before any briefing occurred, or at least many months before any briefing occurred, that counts two and three, which were both tortious interference counts, were being appealed. These are skilled attorneys on the other side. They knew as well as anybody that this was an error and that the operative complaint was a Fourth Amendment complaint. As they even noted in their brief, you know, this issue has been litigated extensively. They knew exactly what the allegations were that were at issue. And I think, again, the most important part is they experienced no prejudice. And also, the appellant did try to correct this through filing a second amended notice of appeal. I think it would be a different story if this was entirely overlooked and we simply raised those issues in the brief. That's not the case. We tried to correct the error, and it was well before any briefing occurred. Therefore, my friend on the other side cannot claim any sort of prejudice as a result of that. And, again, the rule is meant to be liberally construed. So this court should be able to consider those issues. They're fully briefed. They're before the court. And, again, because there's no prejudice, there shouldn't be a jurisdictional bar. So I have a question regarding your client's status with regards to Northwestern. Was she an employee or an independent contractor? Well, Your Honor, in the context of a retaliatory discharge claim where alleging she was an employee, the tortious interference claims are pleaded in the alternative where we allege that she was an independent contractor. But I'm going to focus on the retaliatory discharge claim because my friend on the other side cites a statute that says that, you know, contract nurses working for a nursing agency are independent contractors. That statute is meant to be in the context of a negligent hiring claim. It's completely separate from a common law retaliatory discharge claim. And here agency principles apply, specifically the factor of control, to determine whether or not she was an employee for the hospital or an independent contractor. And this issue is analyzed at length in the case of Hanson where the court found and specifically said that, you know, the staffing agency is not in the business of treating patients. The hospital is. In that case, the court found that because the nurse is using all the materials from the hospital, she's following doctor's directives, she's prescribing and administering prescriptions to the patients per doctor orders. The nurse, despite the fact that she was, you know, retained through the hospital through an independent staffing agency, is considered an employee of the hospital under the common law agency principles because the hospital controls every aspect of her schedule, every aspect of her job, and the like. So she was an employee in the context of the retaliatory discharge claim. But even if she's not, then for the tortious interference claims, it further supports the fact that those claims should have not been dismissed and moved forward. So you're saying that she's an employee for the hospital, even though she's actually employed by the staffing agency? Yes, Your Honor, under agency principles. You know, although she was, essentially the staffing agency is what led her to work for Northwestern Memorial. Once she was there, the staffing agency was wholly irrelevant other than that it paid her. But she was taking orders from the hospital, and she was ultimately terminated by the hospital. I can think of no factor that speaks to control greater than that. So her contract was terminated, correct? Correct. Not so much she was terminated, it was her contract that was terminated. Correct, Your Honor, but regardless of the fact that there was a contract, it doesn't negate those agency principles of control where she's abiding by the schedule that the hospital sets, she's following doctor's orders, she's in the hospital space. And again, as this Court noted in Hansen back in 1997, way back, the hospital is in the business of treating patients, that's what she was doing. The staffing agency is in the business of providing nurses to those hospitals. Once she's in the hospital setting, she's an employee pursuant to agency principles that are well established. Your Honor, in this case, the hospital banned its nurses from wearing N95 respirators at the start of the deadly COVID-19 pandemic. The appellant sent out an e-mail when she heard that she was no longer allowed to wear an N95 mask. She sent it out to over 100 of her colleagues. She said she was told that she was no, I thought, and I'm going to look back at her deposition. I don't recall her ever saying that she was told that she could not use an N95. Is that a correct statement? Your Honor, that is not correct. Per the affidavit submitted by Nurse Thornton, as well as my client in support of our motion for summary judgment, around March 16th or March 17th, her boss, Sharon Warr, pulled all the nurses out of the unit and said, you all have to wear simple surgical masks. You can't wear N95 respirators. And, in fact, when you're in the hallway not treating patients, you can't even wear a simple surgical mask at all. So it was a prohibition against N95 respirators. So was that before the e-mails? Because she contacted Ms. Ward, right? Your client contacted Ms. Ward, and Ms. Ward, regarding the mask, said, let's talk about it. And then after that, without talking to Ms. Ward or anybody else, your client then sent out the e-mails to everybody else in the nursing community at Northwestern. Your Honor, your recitation of the facts are correct, but it was Nurse Weitrich. I was going to say Wick. Weitrich, exactly. It wasn't Nurse Ward, it was Ms. Weitrich. But you have to put it all in context. So around March 17th, Nurse Warr pulls everyone out, says, only surgical masks, no respirators. At this point, they're treating suspected COVID patients. Elderly and chronically ill people are coming to the hospital with high temperatures. They're coughing, they're sneezing, they're wheezing. People in the unit are even being nebulized, shooting the deadly contagion into the air in a foggy mist. At that point, that's when they say, we're going to be converting this to a COVID rule-out unit formally. You're going to be exclusively treating these patients who are coughing, sneezing, and wheezing. Just imagine for one second my client's fear upon learning she's not going to be able to protect herself. And that's why prior to even sending that mass email, she said to her boss, Ms. Weitrich, you don't send a Marine into combat without gear, without proper ammunition. And that's essentially what Northwestern Memorial was doing here by banning N95 respirators when treating these patients who are coughing, sneezing, wheezing, high temperatures. But you will agree that that conversation through the emails didn't exist in terms of let's talk about it. So she wasn't told no, she was just said let's talk about it, which couldn't be interpreted to mean anything, right? That's correct, Your Honor. But regardless of the fact, she was planning to come up to work the next day and be treating COVID patients in a COVID rule-out unit. So there really wasn't any time to discuss it. It was an urgent situation. And through this prohibition against N95 respirators, Northwestern Memorial Hospital was putting patients' lives at risk as well as its own personnel, including my client, the appellant. So it's not a simple workplace dispute of come talk to your boss about this and we'll figure it out tomorrow. It was a matter of life and death in the mind of the appellant. Just imagine people were being nebulized. They can't breathe. And in fact, my client did contract COVID weeks later after she was terminated. So, you know, this is not an abstract concept. At this point, we all remember, we were all living through it. We were sheltering at home and the governor's disaster proclamation stated just that. On March 9th of 2020, nine days before this email was sent and she was terminated, it described COVID as a dangerous, highly contagious disease. It's transmitted through coughing, sneezing. And those at risk are elderly and people with chronic conditions. That perfectly tracks the patients that my client was treating and the symptoms they were displaying when they showed up to Northwestern Memorial Hospital. And my client was essentially doing intake before March 18th when it was converted into a COVID rule-out unit. So is your client alleging that you said that she ended up getting COVID? Is she alleging that the COVID that she received was a result of her employment at Northwestern? No, Your Honor, and that fact isn't in the record, so I'm not going to expound on that. I was just making a point that the risk was real. The risk was great. And the likelihood of catching COVID in a room where people are being nebulized and the virus and contaminant is shooting into the air like smoke is very high. And a simple surgical mask does not protect against that hazard. You said that the governor's proclamation came out on March 9th. When did the Center for Disease Control statement come out and what did it say? So, Your Honor, there were several memorandums that were released to the public from CDC and OSHA. The first, at least in the record, was February 29th of 2020. The most important ones that articulate the clearly mandated public policies here were issued on March 10th of 2020 and March 14th of 2020. And the March 10th memo stated, absent supply chain issues, healthcare facilities should use respirators when treating patients with known or even just suspected COVID-19. And it also contained specific guidance for aerosolization procedures like nebulization, which is what was occurring in my client's unit. And it said, even if you're just in the room where that procedure is occurring, you need to be wearing an N95 respirator or higher. That was released on March 10th, eight days before my client sent her email, nine days before she was fired. On March 14th, OSHA gave more specific guidance interpreting OSHA regulations that were already in place concerning the use of N95 respirators, which were already required to be worn by healthcare workers treating people with respiratory infections like measles or tuberculosis, or in a healthcare setting when there's contaminants in the air or at a construction site. So the March 14th memo was OSHA applying that pre-existing guidance to the present circumstances of the pandemic. And it said that healthcare facilities should be making a good faith effort to follow this existing guidance, absent a shortage. And there was no shortage here. And that's one of the issues that the lower court got wrong, in part based on misrepresentations made by opposing counsel in this case. During my client's boss's deposition, Nurse Weichurich, opposing counsel stopped the line of questioning and said, this case has never been about supply shortages. All of their opponents testified there was no shortage, and Northwestern Memorial had an ample supply of N95s. Appellant relied on these representations and was prevented from making a record on that topic. But then they turn around in their motion for summary judgment, as well as their brief on appeal, and the entire argument hinges on this concept that, wait, there is a shortage, but it's on a national level. There's no evidence in the record that there was a national shortage. What CDC and OSHA said is that parts of the nation are experiencing a supply shortage of these N95 respirators. But what's going on in Los Angeles, California, or New York City, New York, has no bearing on what was occurring in Chicagoland or at Northwestern Memorial Hospital. And if you actually think critically about the CDC and OSHA guidance, it would be completely absurd to say, if there's no shortage of N95 respirators, you have to wear a face mask, because that would thereby further spread the contagion when there's community transmission, further put people's lives at risk, and it would exacerbate the problem. So there's no evidence of a shortage here. And to argue that there was a national shortage, apparently it persuaded the lower court below, because in its opinion, granting summary judgment on the retaliatory discharge claim, the lower court said, and I quote, there's no evidence that the supply chain was restored from 316 to 319. There's no evidence the supply chain was disrupted. And regardless, at Northwestern Memorial Hospital, as testified by several individuals, including my client's boss and another nurse, there wasn't a shortage of N95 respirators. I'm sorry to interrupt you, but is that alleged misrepresentation the basis for your Rule 137 sanctions? Yes, Your Honor. Because it deceived the court below into thinking that there was a national shortage, which would make the clearly mandated public policy articulated in OSHA's CDC guidance, it would fit within that condition, where if there is a shortage, you can wear a face mask in lieu of an N95 respirator. But absent that shortage, opposing counsel has a real problem in this case. So by arguing there's a national shortage, it's essentially and effectively fitting a square peg into a round hole. There was no national shortage here. Well, did you – I'm sorry. I may have – you said counsel argued that there was a – that there was a national shortage. Is that correct? Correct. Because there was no evidence in it. So that's argument. Correct. But it was contradicted by the testimony of their own opponents, as well as their own – I'm not saying that. I'm thinking of sanctions argument. Oh, I see. As opposed to evidence, you're giving the judge incorrect evidence. But if somebody argues something – I mean, I can argue this guy is pink or purple. The judge doesn't have to. Or he shouldn't – he or she shouldn't consider that. Well, that's correct, Chief Justice. But what can be seen in the opinion below is that this judge had a severe bias against my client. Even a hatred is demonstrated in his opinion. What he said is that when my client sent her email, and I quote, it was a screaming digital rant. It was an emotional, irrational incitement of panic, fear, and hysteria. How callous. This person was putting their lives on the line, helping people with COVID-19, to say that this is a screaming digital rant as an injection of personal bias into his opinion that's reflected in other ways throughout his order granting summary judgment on the retaliatory discharge claim. Specifically, the lower court made improper credibility determinations multiple times. For example, to call her email unprofessional and therefore reach the conclusion that her termination was justified is completely contradicted by the appellant's boss, Nurse Weitzerich, who testified during her deposition that the email didn't violate any of the appellant's policies and that she actually perceived the email as the appellant trying to protect her coworkers. Also, Nurse Thornton, who's in the same unit as my client, testified that she was grateful for the email, she felt the same way, but she didn't have the courage to speak up. On summary judgment, it's completely improper to ignore that favorable evidence for the non-movement and instead make this biased opinion that my client is making a screaming digital rant. When she's just trying to save lives, she's trying to protect people, and she's putting her life on the line every single day she's going to work. And with that being said, the lower court should have never even determined whether her termination was justified or not, because that speaks to the causation element of the retaliatory discharge claim, and it's well established from Michael v. Precision Alliance Group, issued by the Illinois Supreme Court in 2014, that when there's evidence that a firing could be pretext versus a legitimate basis, that should go to the trier of facts to determine. Not a court that is seeking to supplant the role of the jury on summary judgment, which is an extreme remedy, and that's exactly what the court did here. Is that the alleged misrepresentation? Is that the sole basis for your Rule 137 sanctions? Yes, the misrepresentation as to shortage. But we're also asking for a new judge on remand below, because of this clear demonstration of bias against my client, as well as these improper credibility determinations that ultimately determine the case. All right. One question about the tortious interference. Unfortunately, at that time when this was happening, there was a high demand for nurses. Did your client lose any possible employment as a traveling nurse because of her termination at Northwestern? Absolutely, Your Honor. I mean, so the contract, she was working at Northwestern under a series of three contracts. The operative contract when she was fired was from February until May. She was terminated in mid-March. She was given no opportunity to mitigate her damages. She was terminated 24 hours after she was fired. And think of it, at the start of the COVID-19 pandemic, she's left without a job. So that contract was terminated. She lost her payment, her housing, her benefits. I mean, it was catastrophic in terms of what that termination did. And with that being said, Your Honors, the Fourth Amendment complaint does speak for itself. The lower court did improperly dismiss those claims. And again, the lower court contravened the applicable standard where it should have been construing the well-pleaded allegations in favor of the appellant, not the appellee. This Court's review is de novo of the Fourth Amendment complaint. And I believe that when Your Honors look at the Fourth Amendment complaint, counts 2 and 3, tortious interference with a contract, tortious interference with a business expectancy, it will be clear that both of those counts more than satisfy the fact-pleading standard. They're substantial. They contain direct quotes from my client's managers. And the lower court simply was viewing this case through a biased lens. And that's why, should the appellant prevail on any of these points, a new judge is necessary to adjudicate these extremely important issues. And with that, I'll rest on the brief and address the rest of the points in my rebuttal. Thank you. Thank you. This is why I never look at the name of the judge to try a case. Now, I don't have to feel like you're abusing somebody that I know. I never do. Good morning, and may it please the Court. Again, my name is Antonio Calderon, and I represent Northwestern Memorial Hospital. This is a case where a plaintiff disagreed with guidance from the CDC, insisted on wearing her own N95 respirator that she obtained from Amazon, and sent an email to 130 healthcare workers rejecting CDC guidance on the use of N95s, telling them that she was going to bring and wear her own N95, and encouraging them to do the same. All of this at the very beginning of the COVID-19 pandemic. Now, you heard counsel make a number of arguments. What you didn't hear counsel articulate is what is the clearly mandated public policy that ending plaintiff's assignment violate because there is none. The only thing counsel relies on are things like the proclamations by the governor of Illinois, disaster proclamations, the closure orders by the shelter-in-place orders by the city of Chicago commissioner. However, as plaintiff acknowledged multiple times, none of those proclamations or orders deal with face masking, let alone face masking in the healthcare setting. What about the meeting that he said Nurse Ward had with everybody and instructed them contrary? Sure. Well, there was a dispute in the record whether that meeting did occur, but that dispute is not material. Nurse Ward or Miss Ward denied having that conversation. In fact, what the record shows is that Northwestern was complying with the CDC guidance at the time on when N95s should be used. And plaintiff was not in a situation where that was an issue. So turning to the CDC guidance on this, what the CDC said is that at the time, the guidance was that COVID was spread via droplets and it was not an airborne disease. And again, you have to go back to March of 2020. We knew very little about COVID at that time, March 18th or March 19th of 2020. You may recall, if you were like me, you were wiping down doorknobs and packages thinking this is how I get COVID. So again, this goes to nothing was clear. There could not be a clearly mandated public policy. A lot of what plaintiff is relying on are orders and decisions that were issued within days of ending her assignment. Now, the CDC guidance was issued, as counsel alleges, a mere nine days before her assignment ended. And what it said was is that you should treat COVID-19 as a droplet as opposed to airborne. And the reason why that's important is because under the CDC guidelines, a simple surgical mask is appropriate for treating suspected or known COVID patients if there is a droplet standard. And the only thing that the CDC said was if you are performing aerosol-generated procedures, then they recommend you use an N95 respirator. Now, this is where counsel makes a lot of misrepresentations. There is evidence in the record, the CDC guidance itself says that, quote, major distributors in the United States have reported shortages of PPE, specifically N95 respirators. This is the standard they're relying on. This is the CDC guidance that they're relying on. We didn't say that. The CDC said it. And we cited to that. So because there was national, there were reported shortages early in the pandemic, the CDC said because this is a droplet disease, then a simple surgical face mask is okay, unless we recommend that if someone is performing an aerosol-generated procedure, then they should use an N95 respirator. Now, the respirator plaintiff did not work on a COVID floor. Her attorney admitted this. She admitted this. Now, the record is unclear on whether the plaintiff worked on a rule-out floor. On the one hand, she says she did it, and that was going to be converted to a rule-out. Remember her email said, if I'm caring for rule-out patients, I'm going to wear an N95, again suggesting she was not. But then in an affidavit, she says, oh, there were people with symptoms on my floor. Because plaintiff worked on a medical observation unit, which is not in the ER and is not in patients admitted to the hospital. This is an in-between where patients are observed. Usually people, for example, who are having chest pains, seeing are they having a heart attack, are they having a stroke, do we need to admit them, or could we discharge them. That's what it was. I have a question. So it appears that we have a conflict here in terms of whether, because she, the plaintiff is claiming that she would have worked in a COVID-19 or treated COVID-19 patients. And then the same thing with regards to the ward meeting, where they're saying it took place and you're saying it didn't take place. Would that have been enough to preclude a motion for summary judgment here? No, Your Honor, because again, the CDC guidance says that you should provide N95s only if someone is performing an aerosol-generating procedure. Plaintiff, there is no evidence in the record that plaintiff performed aerosol-generating procedures on known or suspected COVID patients. Her deposition, we went at length and discussed what her duties were, what her work environment was like. She never said, I used a nebulizer or I treated COVID or I did aerosol-generating procedures on suspected or known patients. The only time she brings it up is in her own self-serving affidavit in response to summary judgment. But even then, she's intentionally vague. She says, and I quote, patients were receiving treatment through aerosol-generating procedures, a nebulizer. She didn't say patients with known or suspected COVID. This is very specific and this is why plaintiff is being intentionally vague on what is this public policy. It sounds from plaintiff and her email that what she wants the public policy to be is I have a box of N95s that I got from Amazon. I want to wear them to work. Okay. And as Justice Reyes, you correctly pointed out, her supervisors never said no. Her supervisor said, let's talk about it. And why did her supervisor say let's talk about it? Here's why. She testified that employers are subject to the respiratory protection of the supervisor. Ms. Wojcicki testified that employers are subject to an OSHA respiratory standard. Okay. This has been cited in the briefs as 29 CFR 1910.134C. And this standard predates COVID. It's been around. And what it requires is employers to do a number of things if they're providing respirators to employees. Things like having employees have medical evaluations to make sure the respirators are safe for the employee. Making sure that employees are properly fit tested. This isn't just a surgical mask or a KN95 that some people use. This is an actual respirator.  Making sure that they're properly fit tested annually. Making sure that they're properly maintained and cleaned. Okay. So what Ms. Wojcicki said is, you know, she was asked, why did you say let's talk about this? She said a few things. She said because it was not usual for employees to have their own personal supply of N95s. So I wanted to make sure, was it expired? Who made it? When was the last time you were fit tested? Okay. Those are the types of questions to ensure that the hospital is complying with the very standard that plaintiff's relying on. Okay. So instead of that, that's why Ms. Wojcicki did not say no. She said let's talk about this tomorrow. So what does a plaintiff do? She's texting a friend in the meantime, saying, you know what, I'm not going to work. I don't want to, quote, argue with her. So she called in sick. And she said, quote, screw the rules. Right. That's what she said to Angela Brion in a text message. And then she sends an email, the email that we all talk about now. It's called the blast email. And she sends the email. Okay. And in that email, is she alleging that Northwestern is violating any public policy or a regulation or an ordinance or anything? No. The email is purely personal. The email starts off by explaining her disagreement. The World Health Organization, the WHO says it's airborne. CDC says treat like a droplet. Seriously. That's how she starts the email. So she's disagreeing with the guidance that she's also relying on in this case. Then she goes on to say things along the lines of, I disagree that the CDC treats this as a droplet. I want to treat it like an airborne. And this is what I'm going to do about it. I have my own box of N95s. I'm going to wear them at home. I'm wearing my N95, period. I have my own boxes. I want to be extra safe and cautious. I, I, I. I disagree, and this is what I'm going to do about it. Employers cannot allow mail. Excuse me for one moment. Yes. Just for a point of clarification. Earlier you spoke about the movement here having a N95 respirator. You spoke about a box of respirators as though they were K N95s. So what are we speaking about? No, to be clear, so what the plaintiff was alleging in this case is that she had her own personal supply of N95 respirators. She mentioned she had a box of them. And she wanted to bring her own respirators because she had her own supply that her husband at the time got off of Amazon. All right. And so this supply of respirators, again, just so that we're clear, describe the respirators for me, would you? So an N95 is a respirator where it looks like a face mask, but at the end has, and I can get into the technicalities of this, but essentially at the end, at the end has a, and it has to be perfectly fit tested. So if you can't wear, you can't have a beard and wear it, you can't have stubble because it needs to suction to your face. So if your honors recall seeing pictures of healthcare workers with those kind of lines around, that's not from, those are from N95 respirators.  And so what happens is it allows when you breathe in to stop, or I'm sorry, when you breathe out, right, to prevent certain particulates from going. And so, and specifically they're designed for airborne particulates, which are much more finer, right, than say a droplet, which is a bigger, let's say, droplet that a face mask can stop, right, splashing in those things. And it is those respirators that you've just described that she claims to have had a box of. Correct. Yes. All right. Very good.  And so, so plaintiff is saying to everyone, hey, I have this, do the same. Disagree with the CDC, everyone bring their own respirator, essentially is what she's saying.   The demand PPEs. Sure, I mean that, that does not, what that doesn't do, because you've got to look at it, counsel talk about context. You've got to look at the email, the entire context. When she says demand proper PPEs, she's not saying Northwestern's not giving them to us. Because, in fact, contrary to what counsel said today, there is evidence in the record that Northwestern did provide N95 face masks. That plaintiff saw employees with wearing N95 face masks, and that as she asked for one, Ms. Richard said, I would not have stopped her from doing it, but I wanted to make sure that we were compliant with OSHA regulations and standards. Okay? So, again, plaintiff has not articulated a clearly mandated public policy here. Okay? The OSHA, I mean, even looking at the OSHA guidance itself, it's important to note that the OSHA guidance is called interim guidance. Right? And the OSHA enforcement guidance, I'm sorry, the CDC guidance is called interim guidance. The OSHA memo that she refers to that was issued on March 14th is called temporary enforcement guidance. Now, what that guidance said is, remember when I said earlier that the regulations require employers to do things like annual fit testing, right, and keep records of those? Well, what OSHA said is, hey, we're in the middle of a pandemic here. Right? We're going to, I'm going to give guidance to local offices that they can use their discretion, and if someone didn't hit it on the 12 months to have that fit testing, that's okay. But OSHA said they should follow the CDC guidelines regarding the types of face masks to use. And we've talked about what that guidance is. So, number one, these were temporary enforcement guidance issued days before her assignment, temporary assignment ended. The CDC was interim guidance, which changed and evolved over time. Okay? So even if we're looking at these guidance in and of itself, they're not clearly mandated public policies. And why is that important? Why is it important that, and I keep talking about having a clearly mandated public policy. Because this appellate court and the Supreme Court has repeatedly held that the tort of common law retaliatory discharge is a narrow exception to the employment at will doctrine. And the clearly mandated public policy must be sufficiently clear as to put an employer on notice that employment decisions that may, of what their decisions may expose them to liability. And that is why even in a healthcare setting, in Turner versus Memorial Healthcare, the Illinois Supreme Court in 2009 found that a concern about not timely charting patient charts was too general of a patient safety concern to find that there is a clearly mandated public policy. So even in a case involving a hospital and a hospital worker where they were wedging generalized safety concerns. We were all concerned. No one's taking the concern away. But this law requires more. There has to be a clearly mandated public policy. Can I ask a question just to get an idea of what it was like at that time? So not everybody who was a nurse or a doctor that worked at Northwestern had to have an N95 respirator. Is that correct? Correct. Okay. So you had to be assigned a certain area to get an N95 respirator? So Northwestern was following the CDC guidance at the time. And what the CDC guidance at the time said is that if you are performing certain procedures, aerosol generating procedures, on a COVID, on a suspected COVID patient or a confirmed COVID patient, then you should wear an N95. Northwestern had N95s and employees were provided with them. Plaintiff in this case was not on a COVID floor. She was not treating COVID patients. Okay. And even in those instances, a simple face mask was sufficient. And Ms. Wichert said again, and I want to make this clear, plaintiff was never going to be denied the opportunity. But as a healthcare worker, she should know that there are rules and regulations for her own safety and the safety of others on these. We can't allow 130 people to start showing up with their own N95s and saying let's all wear them. Okay. So that was the concern here. Okay. Moving on. So plaintiff has not established a clearly mandated public policy. The circuit court was also, the circuit court also correctly found that plaintiff's concern was purely personal. I mentioned this a little earlier and we'll go into it a little bit more. Plaintiff was expressing her personal disagreement with the CDC guidance at the time.  Now that, and it's very clear, the law is very clear, personal concerns do not create mandated public policies and do not create a common law, a claim for a common law retaliatory discharge. Now moving on, plaintiff takes issue with the finding that her conduct was inappropriate. And I think what's important here is the context of what was going on. Okay. On March 11th of 2020, plaintiff manager Ms. Wichert sends an email to the department, about 130 people. And the email talks about things of what's going on. It contained information about clinical guidelines and FAQs with COVID, encourage people to stay at home if they're sick, tell them where they can get free COVID tests, things along those lines. A week later, plaintiff sends this email, the one we now know about, and starts going on with her personal opinions, disagreeing with public health professionals, and telling them, I'm going to violate, essentially, I'm going to bring my own N95s. I'm going to violate the OSHA standard here. In the meantime, plaintiff, or Wichert says, let's talk about this tomorrow. Plaintiff disregards that, sends this email. Next morning, plaintiff sends another email to her supervisor, saying, I don't care what you say. I'm going to be wearing, I'm paraphrasing, I'm going to be wearing an N95, period. So doubling down. You can talk to me all you want. I'm going to wear my N95. Well, we couldn't have that. And so, based on this conduct, her assignment was ended. Plaintiff has to create, now they're making a lot about causation here, but there's no dispute as to her conduct. Right? There's no issue for a jury to decide. The email is very clear. Her conduct is very clear. She has to show that they were trying, they were terminating her assignment, ending her assignment, two months early, ending her assignment because she was complaining about safety or whatever mandated public policy she thinks. There's no evidence in the record of that. Let me ask you a question I asked counsel at the beginning. So what was her status? Was she an employee of Northwestern or was she an independent contractor? Does it really matter because of the public policy implications? No. So she was not an employee. In fact, plaintiff, in her deposition, said something. Said, I would think of myself and call myself an independent contractor. Okay? And the reason for this is as follows. So Northwestern supplements its nurse population in times of need and they go out to temporary staffing agencies. And they use an intermediary called Vizient. And what they do is they go to Vizient. Vizient works with a number of agencies to source those nurses. And plaintiff was employed by TotalMed. And plaintiff had essentially kind of like every time she gets an assignment, there would be an assignment agreement. And that assignment agreement would talk about what the assignment was. And TotalMed acknowledged, you're our employee, you're employed at will, and this is what your assignment. Now contrary to what plaintiff claims, TotalMed did more than just issue plaintiff a paycheck. It would halve taxes from her earnings, issued her W-2, paid her housing stipend, and reimbursed her for expenses like parking, and provided workers' compensation coverage for her. Okay? So this wasn't a situation where, so TotalMed agrees that they're an employer. Plaintiff agrees that she was not employed by Northwestern. Now our counsel's making arguments for obvious reasons. Because they have to. Okay? And the cases that plaintiff relies on, plaintiff talked a lot about this Hansen case. Now Hansen is a medical malpractice case. Okay? Where a nurse, not to get into too much detail, did something wrong, injured a patient, and the patient's family sued, and sued the hospital, and sued the agency. Very different case here. Because they were trying to hold the agency vicariously liable for her work. So when we're talking about, well, Hansen talked about, you know, the materials and everything was provided by the hospital. That was in the context of a medical malpractice case. Not an employment case. Okay? So clearly it's relevant where the materials are coming from when you're talking about an injury at a hospital. Okay? So that's why Hansen does not help her argument. And also, in Hansen, the agency disclaimed an employment relationship. Whereas here, TotalMed does not disclaim that plaintiff was her employer. So are there any cases that allow a non-employee to bring retaliatory discharge? No, Your Honor. No, Your Honor. The cases are clear that only employees can bring common law retaliatory discharge claims. Now, Your Honor had some questions about the tortious interference claims. Okay? And more specifically, what happened to plaintiff after her assignment at Northwestern ended? And I think this is important because the record is very clear on this. Plaintiffs had never alleged that her employment with TotalMed was terminated. In fact, there was evidence in the record that TotalMed was sending plaintiff opportunities to go work elsewhere. She chose not to because what was she doing? She was on Dr. Phil talking about this lawsuit. She was going on every news station giving interviews with her attorney talking about this lawsuit. She was traveling to Florida. This is all in her deposition.  So there is no evidence in the record, and I think this is important, that TotalMed ever terminated her. She was still in contact with Angelo Bruno, the recruiter. He's a recruiter at TotalMed. That was her main contact there. And he was sending her opportunities to work. Okay? Counselor? Yes. Can you address the question that I asked to Avalon's counsel regarding our jurisdiction to hear the tortious interference claim? Sure. So obviously we disagree with plaintiff's position on that. Jurisdiction cannot be given to the court just because of a clerical error. And this is not a clerical error, and I want to make that clear. We addressed this in our briefs, that the notice of appeal both identified the wrong date and the wrong operative complaint. Okay? So this was not a clerical error. I was in the first one and then the initial one. Did it even – Not until after the meeting. No, but I mean the very first complaint. Did it have counts two and three in it at all? So the – And then I know – So the complaint that she's alleging that she – the third amendment complaint, which is the one that's in her notice of appeal, did have counts for retaliatory or common law tortious interference. That's the one she was asked me to file. That's the fourth amendment. Oh. So the issue here is she was given – this is a – she was given so many opportunities to probably plead. I'm not talking about the complaint. I'm talking about the notice of appeal. The first notice of appeal – Did not mention it at all. That's what I thought. Correct. It didn't mention it at all. The amended notice of appeal mentioned counts two and three, but the wrong year –  Or the wrong complaint, the third amendment. The wrong complaint and the wrong court. Correct. Right. And then the one that counsel's attempting to get us to allow them to file is the one that now has the correct dates of the – Correct. So the order that counsel appealed within time is in order to dismissing in a third amendment complaint counts for common law retaliatory – oh, I'm sorry, tortious interference with a contract and tortious interference with a business expectancy and giving her leave to replete it, which she ultimately did and was dismissed a final time. What happened with the second amendment complaint? There were variations. So what plaintiff did was she brought in other claims. She brought in individuals, and there's no individual liability. She made claims for a statutory Illinois whistleblower claim, which didn't come to place here because she didn't make any complaints to government agencies. So there were a lot of them cleaning up of pleadings because the plaintiff was just trying to throw everything at the wall and see what sticks. So we went through variations. But in the second amendment complaint, there was a claim for a common law tortious interference with a contract. And then it was dismissed, allowed to replete, and she just couldn't get through the pleading stand. Simple as that. So in closing, justices, we ask that the court affirm the decision of the circuit court and also find that the appeal of the dismissal of the fourth amendment complaint, the court does not have jurisdiction and should be dismissed. Thank you.  May it please the Court. A few points I'd like to make in rebuttal. The first being, in sitting here listening to a closing counsel make his arguments for both the retaliatory discharge claim and the tortious interference claim, I heard several issues of material fact that should have precluded summary judgment for the retaliatory discharge claim. One, whether the meeting banning N95s actually occurred. Two, whether she's an employee or not, the availability of N95 respirators at Northwestern Memorial, the rule-out issue, as well as whether or not the appellant actually treated suspected COVID patients, which is determinative of this case. The other point I want to make in terms of standard of review, when discussing tortious interference, opposing counsel raised several points of evidence. This was a motion to dismiss. It's contained in the four corners of the complaint and the allegations therein. That's what this Court should be focused on, not any evidence adduced during discovery. We weren't given that opportunity in this case. The other point I want to make, and it speaks to the clearly mandated public policy, opposing counsel pointed out the headers of the CDC and OSHA guidance being temporary or interim guidance. That doesn't not make it a clearly mandated public policy. Pursuant to that logic, in any emergency situation, there can never be a clearly mandated public policy because certain regulations are evolving. What was consistent here, and this is the clearly mandated public policy, as articulated in OSHA and CDC guidance, is for health care professionals to wear N95 respirators, first, when treating suspected COVID patients, but second, and I think what's more important here, is when in a room where patients are being nebulized. Opposing counsel acknowledges in this brief that the regulation applies to rooms where nebulization is occurring for health care professionals to wear N95 respirators. As Judge Sheehan said below, before this case was assigned to the judge who ultimately dismissed the counts and granted summary judgment here, it's clear that Illinois has a clearly mandated public policy to prevent the spread of COVID-19 and protect the health and safety of its citizens, and that policy is clearly implicated by the use of face masks by health care workers. That's where the CDC and OSHA guidance comes in, with the background being the governor's executive orders declaring that there's communal transmission, that all areas, every single county in this state was declared a disaster area, describing how this disease spreads through coughs and sneezing, like other respiratory illnesses. That provides the background for the more specific, clearly mandated public policy articulated by CDC and OSHA, and they never wavered, at least up until the point at which the appellant was terminated, that N95 respirators should be used when treating suspected COVID-19 patients and when health care professionals are in a room where people are being nebulized. Only when there's a shortage are face masks, simple surgical face masks, acceptable. No shortage here, no supply chain disruption. Do you honors have any questions? I don't, counsel. I think I must want to practice law again. I mean, as a practitioner, I keep calling these gentlemen counsel. I don't have any, we don't have any. Well, to conclude, the appellant respectfully asks that this court reverse its summary judgment on count one, the retaliatory discharge claim, reverse the dismissal of the tortious interference claims, count two and count three of the Fourth Amendment complaint, reverse the denial of Rule 137 sanctions, and remand this case for additional proceedings before an unbiased, fair judge. Thank you. Thank you. Thank you. All right. I would say the briefs were very good. I enjoyed reading them. I have to read everything again. I really want to read the depositions. Again, we're going to have a decision, I will say, shortly. Thank you all. And at this time, we will stand in recess.